IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JASON GLEN McKINLEY
ADC #139327 PLAINTIFF

V. NO. 5:07cv00239 JWC

EVERETTE WILKERSON, et al DEFENDANTS

MEMORANDUM OPINION AND ORDER

## I. Background

On September 17, 2007, Plaintiff filed this 42 U.S.C. § 1983 civil rights action (doc. 2). On February 1, 2008, Defendants Cole, Wilkerson, and Wickers filed a motion for summary judgment and brief in support (doc. 35, 36) seeking to dismiss Plaintiff's complaint on the grounds that he has failed to state a viable excessive force claim. Alternatively, Defendants contend that they are entitled to qualified immunity. Plaintiff, through appointed counsel, has fully responded to the motion (see doc. 69, 70, 71, 72).

### A. Plaintiff's Facts

According to Plaintiff's amended complaint (doc. 21), on November 12, 2006, he was arrested by Defendant Cole without incident and transported to the Sheridan Detention Center where he was placed in the booking cell. He did engage in conversation through a talk screen in the booking cell door with a female that was also arrested in connection with the same incident. Plaintiff removed his shoes, socks, shirt, and pants in anticipation of shower and dress-out to be placed in general population. Plaintiff alleges that Defendant Wilkerson began screaming and cursing at him and then he and Defendant Wickers approached his cell. Defendant Wilkerson had his taser drawn. Plaintiff grabbed

his belongings, entered the hallway, and proceeded to the door of the visitation room. As he entered visitation, Defendant Wilkerson forcefully grabbed him by the arm and tried to shove him into visitation. When Plaintiff reflexively pulled away, Defendant Wilkerson used the taser on him— aiming first at his ribs. Plaintiff dropped his clothing, fell to the floor, and reacted by grabbing Defendant Wilkerson's arm, pinning and pulling off Defendant Wilkerson's necktie. Plaintiff claims he was lying on the floor of visitation on top of his clothing when Defendant Wilkerson used his taser again— this time to his neck. This second shock caused Plaintiff to convulse and hit his head resulting in several knots that are still visible as well as a four-inch long gash, fully lacerated to the skull. While waiting for emergency medical services ("EMS") to arrive, Plaintiff had a seizure. This was allegedly not reported to EMS technicians. Plaintiff claims that Defendants Cole and Wickers both observed Defendant Wilkerson draw his taser before approaching Plaintiff and apply both shocks but did not intervene to prevent the assault and battery. Following the incident, Plaintiff was taken to Hot Springs County Memorial Hospital where eleven staples were placed in his head to close the laceration. Since this incident, Plaintiff alleges that he now requires medication for epileptic seizures and severe migraine headaches and will remain on these medications for the remainder of his life. He further alleges that due to his permanent disability he is unable to pass a physical and will be unable to maintain a regular job once he makes parole.[1]

[1] Plaintiff's deliberate medical indifference claim against Defendant Huey (in connection with and following the alleged assault) is not addressed in this memorandum opinion and order.

**B. Defendants' Facts**

Defendants' statement of facts differ significantly from the allegations of Plaintiff's complaint (see doc. 37). According to Defendants, Plaintiff was booked in the Sheridan Detention Center for theft of property, breaking and entering, forgery (2nd degree), failure to register as a sex offender, possessing instruments of crime, possession of a controlled substance, and disorderly conduct. All of these charges are felonies, except the disorderly conduct charge, which is a misdemeanor (see doc. 37, Exhibit "A"). At the time of Plaintiff's arrest it was apparent that he had been consuming alcohol since there was a strong odor of intoxicants on his person (see doc. 37, Exhibit "C"). Plaintiff was taken to the Sheridan Detention Center for booking and was placed in a holding cell. As Defendants Wilkerson and Wickers were processing a female involved in the arrest, Plaintiff stood at the door of the holding cell screaming and shouting profanities at the officers (see doc. 37, Exhibits "C", "E", "F", and "G"). Twice, Defendant Wilkerson went to the holding cell and instructed Plaintiff to stop screaming and to go sit down. As Plaintiff continued to scream and shout profanities at the officers, Defendants Wickers and Cole each went to the door and requested that Plaintiff quit screaming. Since Plaintiff would not stop screaming and cursing at the officers, Defendants Wickers and Wilkerson decided to put him in the visitation room where he would not be heard and could be monitored through the windows by the officers.

When Defendants Wickers and Wilkerson went to the holding cell to take Plaintiff to the visitation room, neither officer had his taser drawn. When they entered the cell, Plaintiff had taken his pants and shirt off and was in an aggressive boxer-type stance. When Defendants opened the holding cell door they requested that Plaintiff go with them

to the visitation room. Plaintiff then reportedly told Defendants "he was going to fuck them up." As Defendants Wickers and Wilkerson attempted to escort Plaintiff into the visitation room, Plaintiff grabbed the door jamb and stiffened up his body. Defendant Wilkerson reached towards Plaintiff to grab his arm/wrist in an attempt to have him go through the doorway of the visitation room. Plaintiff then turned around and grabbed Defendant Wilkerson by the arm and shirt collar (see doc. 37, Exhibits "C" and "G"). In response, Defendant Wilkerson grabbed his taser and drive-stunned Plaintiff on the left side of his body by his ribs. Plaintiff pulled away from the taser and came around and swung at Defendant Wilkerson with his fist. After Plaintiff swung at Defendant Wilkerson, the left side of Plaintiff's neck was exposed and Defendant Wilkerson stunned him in his neck. Plaintiff fell against the door jamb/metal bench inside the visitation room and suffered a 1" to 1 ½" gash on his head (see doc. 37, Exhibits "C", "E", "F", and "G"). Plaintiff denies each of the above facts (see doc. 72).

Plaintiff concedes (see doc. 72) that Defendant Cole gave him several paper towels to stop the bleeding from the gash and MEMS was called for medical assistance. Plaintiff admits (see doc. 72) that he threw the paper towels on the floor and began hitting the top of his head with the palm of his hand to make it bleed more. Blood began running down into his mouth, and he started to spit the blood on the walls and windows and onto his body. He continued to yell and make threatening statements to the officers (see doc. 37, Exhibits "F" and "G"). Plaintiff asserts in his amended complaint that he suffered a seizure from being tasered, but witness' accounts indicate that due to Plaintiff hitting his head repeatedly with his hand, hitting the windows in the visitation area, spitting blood and screaming and cursing at the officers, he fell to the ground and laid down until the

paramedics arrived (see doc. 37, Exhibit "G"). Plaintiff now concedes this as well (see doc. 72). Plaintiff also concedes (see doc. 72) that when the MEMS ambulance service arrived, they identified themselves to him and informed him that they were there to treat him. Plaintiff continued to be uncooperative, making threats to the officers. After approximately twenty minutes of struggling with Plaintiff, the EMTs were able to secure a bandage on his wound and get him on the gurney to transport him to the hospital (see doc. 37, Exhibit "H"). Plaintiff concedes (see doc. 72) that Defendants escorted the EMTs while they were wheeling him to the ambulance due to his unruliness and Plaintiff continued yelling that he knew where Defendant Wilkerson lived and when he got out he was going to kill him. Plaintiff attempted to get up from the gurney and physically confront Defendants. The EMTs found it necessary to administer 5 mg. of Haldol in order to calm Plaintiff and provide for the ambulance crew's safety. Plaintiff also concedes (see doc. 72) that EMT Snyder did indicate in his report that Plaintiff asked if he worked in Sheridan and when he replied in the affirmative, Plaintiff told him to get ready to work a gunshot wound to the head of the arresting officer. Plaintiff stated to Snyder that it was his intent to get even after he was released from custody. In addition to the pending felony and misdemeanor charges, Plaintiff was also charged with two counts of terroristic threatening (a Class D felony) for threats made against Defendants (see doc. 37, Exhibit "I").

Defendant Wilkerson prepared and filed a Use of Force Taser X-26 report regarding the incident (see doc. 37, Exhibit "D"). Sheridan Police Chief Defendant Hooks requested an investigation of the incident which was performed by Ptl. York Cook. After Ptl. Cook reviewed all the statements obtained from the jailers on duty, MEMS personnel, and Plaintiff, it was his opinion that this was a situation where a hostile or potentially hostile

person was threatening himself or another person and using a taser as an alternative to a hands fight or "wrestling match" prevented injuries to officers as well as the detainee. It was Ptl. Cook's opinion "that Officer Wilkerson acted within the guidelines of Department Policy and Procedure for both Use of Force and the X26 Taser" (see doc. 37, Exhibit "C").

## II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court must view the evidence in the light most favorable to the nonmoving party, giving him the benefit of all reasonable factual inferences. Reed v. ULS Corp., 178 F.3d 988, 990 (8th Cir. 1999). A moving party is nevertheless entitled to summary judgment if the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he will have the burden of proof at trial. Celotex, 477 U.S. at 322-23. To avoid summary judgment, the nonmovant must go beyond the pleadings and come forward with specific facts, "by [his] own affidavit" or otherwise, showing that a genuine, material issue for trial exists. Id. at 324; Fed. R. Civ. P. 56(e). A nonmovant has an obligation to present affirmative evidence to support his claims. Settle v. Ross, 992 F.2d 162, 163-64 (8th Cir. 1993). A litigant's verified complaint is generally considered an affidavit for purposes of summary judgment. Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994).

**III. Analysis**

Plaintiff was a pretrial detainee, not a prisoner convicted for having committed a crime, at the time of the alleged events that gave rise to his claims. In situations in which excessive force is alleged by a person in custody, the constitutional standard applied may vary depending on the status of the alleged victim. For instance, if the victim is an arrestee, the Fourth Amendment's "objective reasonableness" standard controls. Andrews v. Neer, 253 F.3d 1052,1060 (8th Cir. 2001) (citing Graham v. Connor, 490 U.S. 386, 388 (1989)). The evaluation of excessive force claims brought by pretrial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard. Id. (citing Johnson-El v. Schoemehl, 878 F.2d 1043, 1048-49 (8th Cir. 1989)). This much is clear: the government cannot inflict punishment, as contemplated by the Eighth Amendment, "'until after it has secured a formal adjudication of guilt in accordance with due process of law.'" City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983) (quoting Ingraham v. Wright, 430 U.S. 651, 671-72 n. 40 (1977)). For these reasons, Plaintiff's claims must be analyzed under the substantive due process clause of the Fourteenth Amendment as opposed to the cruel and unusual punishment clause of the Eighth Amendment. Bell v. Wolfish, 441 U.S. 520, 535 n. 16 (1979); Doe v. Washington County, 150 F.3d 920, 922 (8th Cir. 1998); Graham, 490 U.S. at 395 & n. 10.[2]

The due process clause protects a pretrial detainee from excessive force amounting to punishment prior to conviction. Graham, 490 U.S. at 395 & n.10; Williams-El v.

[2] Due process requires that a pretrial detainee not be punished; the Eighth Amendment requires that the punishment imposed not be cruel and unusual.

Johnson, 872 F.2d 224, 229 (8th Cir. 1989). The use of force against a pretrial detainee must be necessary to some legitimate institutional interest such as safety, security or efficiency, and the force used may not exceed that reasonably believed necessary to achieve those goals. Johnson-El, 878 F.2d at 1048 (stating that the injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency). Therefore, the appropriate inquiry is "whether the [defendants'] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. The reasonableness is to be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. The court must allow for the fact "that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97.

Prior to the use of force, Plaintiff asserts that Defendant Wilkerson, without any provocation at all, tasered him twice while Defendants Wickers and Cole watched and failed to intervene. Defendants refute Plaintiff's version of the facts, and contend that Defendant Wilkerson was justified in using the taser in response to Plaintiff's irrational and combative behavior and to restore order and safety within the jail. Plaintiff has admitted Defendants recitation of the facts following the assault— i.e., hitting the top of his head with the palm of his hand to make it bleed more, spitting the blood on the walls and windows in the visitation room and onto his body, yelling and making threatening statements to the officers, not cooperating with the MEMS personnel, threatening to kill Defendant Wilkerson, and attempting to get up from the gurney and physically confront Defendants. Defendants'

evidence indicates that Plaintiff was moved to the visitation room because his incessant yelling and cursing and his failure to cooperate were interfering with their ability to book his girlfriend, who had been arrested with him (see doc. 36). While it is difficult to explain why Plaintiff suddenly became highly irrational, combative, and agitated following the use of the taser yet was completely calm, cooperative, and docile prior to its use, this Court must nevertheless view the facts in the light most favorable to him. Moreover, Plaintiff's counsel has indicated that Plaintiff has a history with the Sheridan Police Department[3] and that his actions demonstrated a strong and known probability that he suffers from severe mental illness and that use of a taser under the circumstances was contraindicated. Plaintiff also contends that the taser was improperly used. Plaintiff's evidence indicates that he was diagnosed with schizophrenia in 2001 and takes various "psych meds" for same. He is also borderline diabetic and suffers from a seizure disorder (see doc. 70).

Clearly, there are disputed issues of material fact between the parties as to whether there was any provocation at all for Defendants' actions and whether those actions were reasonable. As such, summary judgment is precluded. In addition, because the parties' recitation of the facts prior to the use of the taser materially differ, Defendants' request for qualified immunity must also be denied. See Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999) (a defendant's assertion of a qualified immunity defense requires the Court to address three issues: (1) whether the plaintiff has asserted a violation of a constitutional or statutory right; (2) if so, whether that right was clearly established at the time of the violation; and (3) whether, given the facts most favorable to the plaintiff, there are no

[3] He reported to a probation or parole officer on a regular basis prior to November 12, 2006, for violations he had allegedly committed in the State of Louisiana.

genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated that right).

## IV. Conclusion

In accordance with the above, IT IS, THEREFORE, ORDERED that:

1. Defendants Cole, Wilkerson, and Wickers' motion for summary judgment (doc. 35) is DENIED.

IT IS SO ORDERED this 1st day of August, 2008.

UNITED STATES MAGISTRATE JUDGE